UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOT M8 LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>SONY CORPORATION OF AMERICA, et al.,<br><br>    Defendants. | No. C 19-07027 WHA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |

**INTRODUCTION**

In this patent infringement suit, defendants move to dismiss the amended complaint. For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

**STATEMENT**

Patent owner asserts six patents against defendants: U.S. Patent Nos. 8,078,540 ("the '540 patent"); 8,095,990 ("the '990 patent"); 7,664,988 ("the '988 patent"); 8,112,670 ("the '670 patent"); 7,338,363 ("the '363 patent"); and 7,497,777 ("the '777 patent"). The asserted patents are directed toward casino, arcade, and video games generally (Dkt. No. 79 at 2). The '540, '990, '988, and '670 patents are asserted against the Sony Play Station 4. The '363 patent is asserted against both the Sony PlayStation 4 and three video games: MLB The Show 19; Uncharted 4; and Uncharted: the Lost Legacy (Dkt. No. 75 at 18). And, the '777 patent is asserted against the PlayStation 4 and three games: the two Uncharted games and God of War.

1  At a November 21 case management conference, plaintiff was directed to file an amended complaint by December 5 specifying "every element of every claim that [patent owner] say[s] is infringed and/or explain why it can't be done [and] if this is a product you can buy on the market and reverse engineer, you have got to do that." Plaintiff obliged, stating "[w]e have torn down the Sony PlayStation" (Dkt. No. 67 at 2–3). On December 5, patent owner timely filed its amended complaint (Dkt. No. 68) and defendants moved to dismiss (Dkt. No. 75). Now, it's showtime.

Unsurprisingly, with six patents in suit and 25-page briefs, the parties' briefs do not expand on the technology at issue, or its alleged impact. Instead, they jump right into the merits of infringement. Defendants challenge a key aspect of the infringement allegations for each patent. Thus, this order does not evaluate the sufficiency of the pleadings in their entirety. Rather, it decides *only* whether patent owner's complaint is deficient on the challenged grounds.

**ANALYSIS**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when there are sufficient factual allegations to draw a reasonable inference that defendants are liable for the misconduct alleged. While a court must take all of the factual allegations in the complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." *Ibid.* Of particular importance below, in both *Twombly* and *Iqbal* the Court made plain: allegations merely *consistent* with liability are not enough. 550 U.S. at 556–57; 556 U.S. at 678. Allegations of infringement "without explanation as to the *how* or *why* these products infringe . . . do[] not lead to any inference that plaintiff may be entitled to relief." *PageMelding, Inc. v. ESPN, Inc.*, No. C 11-06263 WHA, 2012 WL 851574, at *2 (N.D. Cal. Mar. 13, 2012).

### 1. THE '540 PATENT.

The '540 patent describes an authentication mechanism for video games. Defendants challenge the sufficiency of the complaint as to the limitations:

- [A] board including a memory in which a game program for executing a game and an authentication program for authenticating the game program are stored.

- [A] motherboard which is different from the board and connects to the board . . . .

('540 patent, cl. 1). Specifically, defendants argue the complaint fails to sufficiently allege that a game program and authentication program are stored *together* in a memory on a board *other than* the motherboard (Dkt. No. 75 at 6–9). Patent owner offers four responses.

*First*, the complaint alleges that when a PlayStation 4 operates games offline, *i.e.* while not connected to the internet, an authentication program checks if the PlayStation 4 is designated the "primary" station for the user account. Patent owner, in its opposition brief, also points in the complaint to three different "board[s]" with memory that are not the "motherboard" (Dkt. No. 79 at 3–4). But, even accepting the pled program *is* an acceptable "authentication program," the complaint fails to allege *when* or *where* the game program and authentication program are stored *together* on the same memory board. The complaint's allegation that the PlayStation 4 "hard drive includes an authentication program for verifying that the PS4 is allowed to the play the game" is: (1) a conclusion unsupported by the allegations offered, which merely allege an authentication program's existence and not its storage location (Dkt. No. 68, ¶ 80(b)–(d)); and (2) does not mean the game program is also stored on that same hard drive, given the *three* memory boards patent owner notes (Dkt. No. 79 at 3). Moreover, the picture of an alleged hard drive in the complaint (Dkt. No. 68 at ¶ 80(b)) provides no basis to infer *what* is stored on that drive. Despite patent owner proclaiming "we have torn down the Sony PlayStation," the complaint does not allege what programs were found *on the* hard drive or what, if anything, prevented such access.

*Second*, the complaint alleges each Blu-ray game disc includes a "ROM Mark" to confirm the disc is an authentic copy of a game and that "[t]he PlayStation 4 includes an authentication

3

program to authenticate the game program on the Blu-ray discs." But alleging the "*PlayStation 4* includes an authentication program" indicates that the program is *not* stored on the Blu-ray disc with the game program. And the complaint describes the ROM Mark as a key, or "Volume ID," required to "decrypt" the disc content, not an executable computer program that itself authenticates the disc (Dkt. Nos. 68 at ¶ 80(e), 79 at 4) (emphasis added).

*Third*, the complaint alleges an authentication program which displays error codes if a game program fails (Dkt. No. 79 at 5, 68 at ¶ 80(f)). But the existence of an authentication program alone does not plausibly indicate the authentication program is stored *together* with the game program. Again, despite patent owner proclaiming the reverse engineerability of the PlayStation 4, the complaint does not explain *what* or *where* programs were found, or what prevented such discovery.

*Fourth*, the complaint alleges the PlayStation Network servers authenticate game programs when users connect. Indeed, it alleges the servers contain both game programs and authentication programs (*ibid.*). But storage on the same server does not mean the game and authentication programs are stored *together* on a memory board. Moreover, the complaint then alleges the authentication program is within the PlayStation 4, not on the server: "[t]he PlayStation 4 uses 2-step verification and a Cryptography algorithm as an authentication program . . ." (Dkt. No. 68 at ¶ 80(i)).

Thus, the complaint fails to plausibly plead the shared location of the game and authentication programs according to claim 1 of the '540 patent. As patent infringement requires the practice of *every* claim limitation, the failure to allege one limitation precludes liability. The claim for infringement of the '540 patent fails.

**2. THE '990 PATENT.**

The '990 patent describes a mutual authentication mechanism for video games. Defendants challenge the limitations:

- [A] removable storage medium storing therein gaming information including a mutual authentication program.

- [T]he mutual authentication unit confirmed to execute a mutual authentication process for the authentication

4

> program to check that the authentication program is a legitimate program according to the mutual authentication program included in the gaming information authenticated by the authentication unit.

('990 patent, cl. 1, 5, 9). Specifically, defendants contend the complaint fails to allege that the mutual authentication program and game program are stored *together* (Dkt. No. 75 at 10–12). Patent owner offers three responses.

*First*, the complaint alleges the authentication program referenced above regarding the '540 patent is a mutual authentication program (Dkt. No. 79 at 7). But, as noted above, accepting as true that the authentication program suffices, the complaint fails to allege *when* or *where* the game program and mutual authentication program are stored *together*.

*Second,* the complaint alleges the PlayStation 4 "NOR flash memory chip includes authentication functionality, as confirmed by the fact that the NOR chip must be removed in order to play pirated (non-authentic) games" (*ibid.*). But, again as above, taking the NOR chip authentication functionality as sufficient pleading of the mutual authentication program, the complaint does not plead *when* or *where* the mutual authentication program and "gaming information" are stored *together*.

*Third*, the complaint alleges a mutual authentication program facilitates communication between the PlayStation 4 and the PlayStation Network Server (*ibid.*). Patent owner points to the assertion in the complaint that "[t]he game program on the hard drive or disc contains a mutual authentication process . . . ." But allegations that track the claim language that closely are conclusory and require support not found in the substantive allegations (Dkt. Nos. 79 at 8, 68 at ¶ 106(o)). So the allegations still fail to allege *where* or *when* the game program and the mutual authentication program are stored *together*.

Patent owner finally contends the complaint states "evidence that the flash memory contains a mutual authentication program and that the game program is stored in the flash memory when the game is loaded" (Dkt. No. 79 at 8) (citing Dkt. No. 68 at ¶ 106(e), 106(q)). The cited allegations do not support this assertion because they do not address where the game program is stored. Moreover, the complaint appears to indicate there are multiple flash memory chips (Dkt. No. 68 at ¶ 106(e)). So merely alleging the mutual authentication program and the

game program are each stored on flash memory at some point hardly leads to the plausible inference that they are stored *together*. This necessary limitation of the '990 patent not plausibly plead, the claims for infringement of the '990 patent fail.

### 3. THE '988 AND '670 PATENTS.

The '988 and '670 patents describe computer program fault inspection. Defendants challenge the '988 patent limitations:

- [A] control device for executing a fault inspection program for the gaming device to inspect whether or not a fault occurs in the second memory device and the game application program stored therein.

- [T]he control device executes the fault inspection program when the gaming device is started to operate and completes the execution of the fault inspection program before the game is started.

('988 patent, cl. 1, 6, 10). Defendants also challenge similar limitations from the '670 patent:

- [A] second memory device configured to store a game application program.

- [A] control device for executing a fault inspection program for the second memory to inspect whether or not a fault occurs in the second memory device.

- [T]he control device completes the execution of the fault inspection program before the game is started.

('670 patent, cl. 1). Specifically, defendants argue the complaint fails to plausibly allege an inspection, completed *before* the game starts, of *both* the second memory device and game program (Dkt. No. 75 at 13–17).

The complaint does plausibly allege the inspection for both the memory device and the game stored therein. Specifically, it alleges the PlayStation 4 reports various error codes, including "Error occurred while accessing the Hard Disk Drive ('HDD') or Blue-ray/DVD Drive" and "The system cannot read the disc" (Dkt. No. 68 at ¶ 128(k)). Given the complaint also alleges games can be stored on the hard drive and on Blu-ray discs (Dkt. No. 68 at ¶ 128(e)–(f)), the inspection of the memory plausibly includes inspection of the game program as well.

But the complaint provides no basis to infer the proper timing of the inspection. The allegation too closely tracks the claim language to be entitled to the presumption of truth:

| The PlayStation CPU will execute the fault inspection program when the gaming device is started to operate[] and completed before the game is started (Dkt. No. 68 at ¶ 128(n)). | [T]he control device executes the fault inspection program when the gaming device is started to operate and completes the execution of the fault inspection program before the game is started ('988 patent, cl. 1). |
|---|---|

No underlying allegations of fact are offered. Thus, the complaint fails to plausibly allege an essential element in the claim for infringement of the '988 and '670 patents.

### 4. THE '363 PATENT.

The '363 patent describes gathering and using game result data from multiple networked gaming devices. Defendants challenge the limitation:

- [A] total result data receiving device for receiving from the server data of a total game result achieved by the first gaming machine and the second gaming machine.

- [D]etermining a specification value based on the data of the total game result received by the total result data receiving device.

('363 patent, cl. 1). Specifically, defendants contend the complaint fails to plausibly allege the receipt of game results from a server (Dkt. No. 75 at 18–19).

The complaint alleges that multiple PlayStation 4 consoles connect via the PlayStation Network server for online multiplayer gaming and specifies the hardware that connects the PlayStation 4 to the network (Dkt. No. 68 at ¶ 48(a)–(f), (m)). For the Uncharted Games, the complaint offers game screenshots: (1) explaining that player game performance is graded; and (2) showing the summary of multiplayer grades (*id.* at ¶ 48(p), (r), (t), (u)). For MLB: The Show 19, the complaint also includes screenshots: (1) explaining player performance ratings; and (2) displaying player ratings and multiplayer game results (Dkt. No. 68 at ¶ 51(s)–(u)). The allegations may be slim (Dkt. No. 81 at 12–13), but the game consoles plainly communicate player performance data across the PlayStation Network server, from which individual consoles receive the game result data.

Defendants also challenge the limitation:

- [T]otaliz[ing] the game result of the first gaming machine and the game result of the second gaming machine on the basis of data of the game result transmitted from the first gaming machine and the data of the game result transmitted from the second gaming machine so as to calculate a total result.

- [R]eceiving data of a game result from the first gaming machine and data of a game result transmitted from the second gaming machine.

('363 patent, cl. 8). Here, defendants argue the complaint fails to plausibly allege the totalization of game data.

The complaint includes screenshots explaining how player performance is evaluated in the Uncharted games, on a graded scale from S to C, and for MLB: The Show 19, with baseball's standard runs-per-inning scorecard (Dkt. No. 68 at ¶ 49(n)–(p), ¶ 52(o)). Such data compilation is a plausible allegation of post-game data totalization. And because defendants challenge the infringement of claim 11 on similar grounds, the motion fails for the same reasons. Defendants' motion to dismiss as to the '363 patent is **DENIED**.

### 5. THE '777 PATENT.

The '777 patent describes the calculation, display, and execution of game characters' order of action. Defendants challenge the limitations:

- [A]n execution order calculation section that calculates an execution order of actions of a plurality of characters in the battle.

- [T]he display control section displays the execution order calculated by the execution order calculation section on the display.

- [W]hen a predetermined combination condition . . . is satisfied, when executing an action of the predetermined ally character, the action execution section also executes an action of the different ally character without following the execution order calculated by the execution order calculation section.

('777 patent, cl. 1, 12). Defendants contend the complaint fails to plausibly plead the PlayStation 4 and video games calculate and display an execution order that is then disregarded if a condition is met (Dkt. No. 75 at 22–24).

The complaint explains that both the Uncharted games and God of War enable player interaction with non-player allied characters. In Uncharted, these are called "Sidekicks;" in God of War the character is named Atreus. In both games, when a player gives an order to an ally, the order displays on the video screen (Dkt. No. 68 at ¶ 174(n)–(o), ¶ 179(b)–(c), (h)). Defendants argue the execution order must be displayed in advance, *i.e.* for future actions (Dkt. No. 81 at 14). This claim interpretation is appropriate at summary judgment, not at a motion to dismiss.

In each game, the complaint alleges allied characters can deviate from the initial execution order under various circumstances. For example, for the Uncharted games, the complaint shows a screenshot of an allied medic with orders to assist a wounded comrade. But, subjected to enemy gunfire (the predetermined condition), the medic hides behind a wall and shoots back, rather than simply running out and assisting the wounded as initially ordered (Dkt. No. 68 ¶ 174(p)).

In God of War, the complaint offers a screenshot of instructions showing how a player may instruct the ally character Atreus to fire arrows from his bow and how to change Atreus' target (Dkt. No. 179(i)). The trigger, though, is the player's command. Though in the above example an aversion to gunfire may be a predetermined condition, the player's real-time command is not a *predetermined* condition causing a change in execution order. Thus, while the claim for infringement of the '777 patent may proceed against the two Uncharted games, the claim against God of War fails.

## CONCLUSION

For the above reasons, defendants' motion to dismiss, as to the '363 patent and the '777 patent claim against the Uncharted games, is **DENIED**. The motion, to the remainder of the claims, is **GRANTED**. The claims for infringement of the '540, '990, '988, '670, and (as to God of War only) '777 patents are **DISMISSED**.

Patent owner has already enjoyed its one free amendment under the rules and was given clear directions to plead well, element-by-element. Patent owner does not deserve yet another chance to re-plead. Nevertheless, should patent owner wish to file yet another amended

9

complaint, it may do so by **FEBRUARY 13 AT NOON** on the condition that it pay all reasonable fees and expenses incurred by defendants in responding to yet another amended complaint. Any such motion must include as an exhibit a redlined version of the proposed amendment that clearly identifies all changes from the amended complaint. This order highlighted certain deficiencies in the amended complaint, but it will not necessarily be enough to add sentences parroting each missing item identified herein. If patent owner moves for leave to file yet another amended complaint, it should be sure to plead its best case and take into account all criticisms made by defendants, including those not reached by this order.

**IT IS SO ORDERED.**

Dated: January 27, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE